**M. Phillip ARTH, Jr.,
Plaintiff-Appellant,**

v.

**UNITED STATES of America and William E. Dauphin, Defendant-Appellee.**

**No. 83–2271.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 15, 1984.

Decided June 26, 1984.

Nancy A. Gibbons, Berger & Taggart, San Francisco, Cal., for plaintiff-appellant.

Michael Roach, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before ANDERSON, SKOPIL, and POOLE, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

After the Internal Revenue Service levied upon $10,628.74 held in a bank account in the name of T/I Pharmaceuticals, Inc., Phillip Arth brought an action pursuant to 26 U.S.C. § 7426 claiming that the funds in the account belonged to him and were wrongfully seized by the IRS. Arth also personally sued IRS Agent William Dauphin for alleged constitutional violations occurring in the conduct of the levy. The district court found the funds were not wrongfully levied and entered judgment for the IRS and Dauphin. We affirm.

## I. BACKGROUND

In the late 1970's, T/I Pharmaceuticals was a partnership that produced dermatology products. Phillip Arth, a certified public accountant, was one of the original investors in the firm as a limited partner. In 1980, T/I incorporated, and Arth became a creditor and shareholder.

Prior to the summer of 1981, T/I encountered severe financial difficulties. Arth secured a number of loans for T/I, including some he personally guaranteed. Also, some of Arth's clients, who had invested in the business, guaranteed some of the loans. Arth agreed to reimburse his clients if any losses were sustained as a result of their guarantees.

By the summer of 1981, T/I was on the verge of financial failure and it went out of production. In August of that year, Arth, as an "independent contractor," entered into a contract with T/I, entitled the "Production Agreement," in which he was to attempt to put the company back into production. Pursuant to the agreement, Arth assumed virtually full control over the management of the business. Arth was to purchase supplies to fill outstanding orders and pay T/I sales personnel. In return, T/I agreed to turn over all its accounts receivable to Arth. It also gave Arth the right to use all trade names and trademarks owned by T/I. For his services, Arth was to receive $2500.00 per month as a management fee and five percent of the net remittances received by T/I.

Of particular importance to this appeal is the agreement of T/I to assign its Bank of America, Woodland Branch, checking account to Arth. The account was little used by T/I and had over 800 checks already printed and ready for use. Arth was to use the account to carry out his obligations under the agreement. At the time of the agreement, there was approximately $400.00 in the account.

One of T/I's outstanding liabilities was over $28,000 in unpaid withholding and payroll taxes. IRS Agent William Dauphin was assigned the task of collection. On September 8, 1981, Dauphin met with Arth and Ray Wrigglesworth, then the president of T/I, to discuss the tax liabilities. At the meeting, the production agreement was discussed but no agreement on a payment plan for the owed taxes was reached.

Soon after the agreement, Arth conducted several transactions in the account, depositing and withdrawing funds to cover T/I expenses. Then, on September 10, 1981, Arth deposited $10,000 into the account. On September 18, 1981, the Woodland Branch was served with a notice of levy by the IRS, requesting the bank to turn over all the funds held in the T/I account. At that time, the account contained $10,628.74. Arth contacted Agent Dauphin and requested that the levy be released. After checking with his superiors, Dauphin refused and the bank turned the funds over to the IRS.

On September 30, 1981, Arth filed this action, seeking a return of the funds pursuant to the wrongful levy provisions of 26 U.S.C. § 7426. He later amended his complaint to name Agent Dauphin individually and claimed that Dauphin violated his constitutional rights, in particular due process, in initiating the levy.

On November 16, 1982, the district court dismissed the claims against Dauphin on the grounds of immunity. A short trial was held in May of 1983, and on June 13, 1983, the district court entered judgment for the United States after concluding that the levy was not wrongful.

II. ANALYSIS

Arth raises two issues on appeal. First, he contends that the district court incorrectly held that the money in the account was the property of T/I, the taxpayer, thereby making the levy proper. Second, he argues that Dauphin was not entitled to immunity from suit for the alleged constitutional violations.

Our conclusion that the district court was correct in finding the levy proper makes it unnecessary to resolve the immunity issue. The question whether IRS agents are entitled to absolute or qualified immunity in this situation, *see Bothke v. Fluor Engineers and Constructors, Inc.,* 713 F.2d 1405 (9th Cir.1983), and *Stankevitz v. IRS,* 640 F.2d 205 (9th Cir.1981) (per curiam), must wait another day.

In 26 U.S.C. § 7426, Congress has given third parties the right to bring an action against the United States when it is shown property was wrongfully seized pur-

suant to levy by the IRS. Property is wrongfully levied if it does not, in whole or part, belong to the taxpayer against whom the levy originated. *See Al-Kim, Inc. v. United States,* 650 F.2d 944, 947 (9th Cir. 1979); *Flores v. United States,* 551 F.2d 1169, 1172 (9th Cir.1977). Pursuant to § 7426(b)(2), the third party may recover the property or the value of his or her interest.

In *Flores,* this court held that the government has the burden of persuading the trier of fact that there is a nexus between the taxpayer and the property. 551 F.2d at 1175–76 & n. 8. We have no doubt that the government met its burden in this case. The funds were located in a T/I bank account. That is sufficient to establish a connection between the funds and the taxpayer, T/I.

■ *Flores* expressly reserved the question of where the burden of proof lies once the government traces the property to the taxpayer and the third party "makes a claim to the property derivatively from the taxpayer, through gift or otherwise." *Id.* at 1176 n. 8. We are faced with such a situation here. Arth claims that because the T/I account was assigned to him and the funds in the account may be traced to him, the money is his, not that of the taxpayer. In this circumstance, we believe it is reasonable to require the third party to prove that property which appears to belong to the taxpayer is actually his. The rationale behind requiring the government to establish the nexus between the property and the taxpayer is that the government will often have greater access to the facts than the third party. *Id.* at 1175–76 & n. 7. In this case, however, the property has been traced to the taxpayer, but a third party is making a claim of ownership which depends on facts that are peculiarly within his knowledge.

■ The district court correctly allocated the burden of proof. Also, its decision on who owned the money in the account, T/I or Arth, is a factual finding subject to the clearly erroneous standard of review. *See id.* at 1172 n. 1.

Arth makes two arguments to show that the money in the account was his, not T/I's. First, he states that T/I assigned him the account. Second, he contends that the funds in the account can be traced to him. The government does not dispute either of these contentions. Nor do we. Pursuant to the production agreement, T/I did assign the account to Arth. The more than $10,000 in the account can easily be traced to Arth's separate funds; Arth deposited the money in the account on September 10, 1981, to pay T/I production costs.

■ The effect of these undisputed facts does not detract from the district court's decision that once placed in the account, the money belonged to T/I. The relevant facts as found by the district court follow: Arth assumed full control of T/I, but nonetheless it remained a separate entity; even though the bank account was assigned to Arth, it remained in T/I's name and the bank continued to consider the account as belonging to T/I; Arth satisfied T/I obligations with funds from the account; Arth characterized the transfer of his funds into the account as "loans to T/I" and Arth satisfied these debts owed to himself by T/I with money from the account; and, although Arth testified that he had in effect set up a separate business entity to manage T/I and he placed funds in the account with the intent of transferring the money to this new entity, the court did not find this testimony believable and no other evidence supported it.

This evidence supports the district court's conclusion that the funds in the account belonged to T/I and were properly subject to IRS levy in order to partially satisfy T/I's tax obligations.

The decision of the district court is

AFFIRMED.